## CHARLESTON.

BUFFALO COLLIERIES CO. v. INDIAN RUN COAL CO.

Submitted January 27, 1914.   Decided February 10, 1914.

1. SALES—*Implied Warranty.*
    There is no implied warranty that an article sold will answer a particular purpose not contemplated by the seller.   (p. 668).

2. SAME—*Performance of Contract.*
    A contract to furnish ''nut and slack'' coal at a stipulated price per ton, made and partly fulfilled at a time when the contractor was
73 W. Va.

shipping dry coal, is substantially complied with by his later furnishing washed "nut and slack" from the same mine, containing more heat units per ton than unwashed coal but mixed in a different manner. (p. 688).

Error to Circuit Court, Mingo County.

Action by the Buffalo Collieries Company against the Indian Run Coal Company. Judgment for defendant, and plaintiff brings error.

*Affirmed.*

*Linn & Byrne,* for plaintiff in error.

*Stokes & Bronson,* for defendant in error.

WILLIAMS, JUDGE:

This writ of error was awarded defendant to a judgment in favor of plaintiff for $726.27, in an action of assumpsit for a balance due on account for coal sold and delivered. Defendant sought to recoup damages for an alleged breach of an implied warranty of the quality of the coal. The jury found against it and rendered a verdict for the whole of plaintiff's demand. Plaintiff is a coal mining company and defendant is a coal selling company. By written contract plaintiff sold, at fifty cents per ton, and agreed to furnish defendant 1800 tons of nut and slack coal per month from its Buffalo mines, for a term effective from July 1, 1910, to July 1, 1911. The coal was shipped direct from plaintiff's mine to the various customers of defendant, as ordered by it. The Ohio Valley Electric Railway Company was one of its customers, and plaintiff was ordered to ship coal to its power plant in Kenova, and did so for several months. It was satisfied with the coal, and made no complaint to defendant until about the first of December, 1910, when plaintiff put in a washer at its tipple, which had the effect of changing the manner of mixing the nut and slack as it was loaded in the railroad car. The wet coal would also sometimes freeze in the car making it difficult to handle by means of an automatic device which it had for feeding its furnaces. The wet coal would not work in this device; it would clog in the chute, and in cold weather the wet coal would freeze and give it trouble; and it had to quit using it. Defendant then supplied it with dry nut and slack, purchased

from another company, for which it had to pay five cents more per ton than it had contracted to pay plaintiff. It sought to recoup this extra price per ton and some other items of expense which it claimed it was compelled to pay because, as it avers, plaintiff did not furnish the quality of coal it had contracted for. It insists that the terms "nut and slack," had a definite meaning in the trade, and related not only to size of the nut and the fineness of the slack and the proportion of each in a car load, but also to the manner in which they were to be mingled in the car. But we think the judgment is right, and should be affirmed for two reasons. (1) Because the record discloses evidence from which the jury might properly find that there had been a substantial compliance with the contract, and therefore no breach of the implied covenant for quality of the coal. (2) Because it appears that defendant knew that plaintiff was about to put in a washer at its mine and also knew of the change it would necessarily make in the manner of mixing the nut and slack, and made no objection thereto. After putting in the washer, which made it impracticable to mix the coal in the same manner in which it had previously been mixed, and after the electric company had made complaint to defendant, it appears that both plaintiff and defendant tried earnestly and honestly to satisfy it with the new preparation of the coal. The record contains much correspondence between them, running over a month or two, and Mr. Edmunds, president of defendant company, made a trip or two to Kenova to ascertain the cause of the complaint. In a letter from him dated Charleston, West Virginia, December 28, 1910, to plaintiff, he says. "We wired you today as follows: 'Continue shipping washed slack. Also rush one nut to mix with unwashed.' We want this one nut to complete burning of the cars of unwashed coal that is on track at present so it is best that you ship it first so as to get those cars off of track." In the same letter he also says he had just had a talk, over the 'phone, with Mr. Magoon, who was the manager of the electric company, and quoted him as saying, "that the washed dust as far as he has been able to tell makes an excellent fire, however they have not had an opportunity to test it completely; yet on what he has seen of it he is willing to let some more of it come in." Continuing the writer says,

"consequently as soon as you get out the nut coal you can start shipping on washed dust at the same rate at which you were shipping N & S before the trouble came up." In a letter to defendant written January 1, 1911, by Mr. Fagin, purchasing agent of the electric company, he says: "Regarding washed coal, can say it burns very freely but we are having great difficulty in unloading, as the whole car load is frozen into a solid mass. This is caused by the extremely wet condition of the coal when loaded. Try and have the coal drained out before loading, otherwise we can not handle it in cold weather." In a letter to plaintiff written January 10, 1911, by Mr. Wright, defendant's secretary and treasurer, after advising it of a trip to Kenova to see the electric company, he says, speaking of the coal: "It is causing a great deal of trouble and expense and we hardly know what to suggest to remedy the matter. You have no doubt noticed how closely this bug dust adheres after being wet, the trouble being after it reaches the bunkers that it has not enough weight to carry it thru the chute to stokers. Is there any possible way that you could mix some of the pea coal with this ¾" coal and thus give it sufficient weight to carry. There is no trouble about its burning and it makes excellent heat and is an alround good steam product so far as we are able to see but this one draw back is a serious problem in this particular plant." In a letter from Mr. Edmunds to plaintiff, January 23, 1911, he says: "Your washed coal has in it more heat per ton than the unwashed, but on account of the mechanical conditions it can not be handled at Kenova with any degree of satisfaction. Your washed coal should be worth more money, where it can be used, than the unwashed." This correspondence shows that the washed coal was better than the unwashed; that it contained more heat units, which is the most desirable quality in coal. It also tends to show that defendant regarded it of greater market value than the unwashed. The defendant's customer was the dissatisfied party, not defendant, and its complaint was not because of the quality of the coal. The gravamen of its complaint was that the washed coal would not work well in the automatic feeder which carried the coal to the furnaces. There is no evidence that plaintiff sold the coal with reference to its being used in any particular

device for the handling of it, which required dry coal, and, therefore, there was no implied warranty that it would answer such purpose. Our conclusion is that the jury was justified in finding that plaintiff had substantially complied with its contract, and we, therefore, affirm the judgment.

*Affirmed.*